**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MONA SARRAI, M.D.,

       Plaintiff,

vs.                                                                                 Civ. No. 16-1299 KK/SCY

ALEX AZAR[1] AS SECRETARY OF THE
DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendant's Motion for Summary Judgment, and Memorandum in Support* (Doc. 35), filed April 15, 2018. The Court, having considered counsel's arguments, the record, and the relevant law, finds that the motion is well taken and should be GRANTED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

This case arises out of a dispute between Plaintiff Mona Sarrai, M.D. ("Dr. Sarrai") and the United States Department of Health and Human Services ("HHS"), which operates the Indian Health Service ("IHS"). (Doc. 1 at 1; Doc. 35-2 at 1, 6.) On February 10, 2014, Dr. Sarrai began working as a contract physician at the Acoma-Canoncito-Laguna Service Unit ("ACLSU"), an IHS service unit in Acoma, New Mexico. (Doc. 35 at 4; Doc. 35-1 at 2; Doc. 35-2 at 1, 6; Doc. 37 at 1.) HHS fired Dr. Sarrai from this position on May 30, 2014. (Doc. 35 at 4; Doc. 35-1 at 2, 4; Doc. 37 at 1.) However, Dr. Sarrai returned to work as a contract

---

[1] When Dr. Sarrai filed this lawsuit, Sylvia Burwell was the Secretary of the Department of Health and Human Services. (Doc. 1 at 1.) Mr. Azar is the current Secretary.

[2] On the record currently before the Court, the facts in this section are undisputed except as noted. The Court will address additional facts as appropriate in the context of its analysis.

physician at the ACLSU on October 19, 2014, for a term to end on May 2, 2015. (Doc. 35 at 4; Doc. 35-2 at 1-2, 4-5; Doc. 37 at 1.)

On October 31, 2014, HHS issued a job announcement regarding a vacant Medical Officer position at the ACLSU. (Doc. 35 at 4; Doc. 35-2 at 2, 6-7; Doc. 37 at 1.) Dr. Sarrai was the only applicant for the position. (Doc. 35 at 5; Doc. 35-2 at 2; Doc. 37 at 2.) Dr. Alan Thorne, the ACLSU's Clinical Director, and Fern Detsoi, its CEO, interviewed Dr. Sarrai, and Ms. Detsoi selected her to fill the position. (Doc. 35 at 5; Doc. 35-1 at 6-7; Doc. 35-2 at 2; Doc 35-3 at 2; Doc. 37 at 2.) On December 11, 2014, HHS sent a letter to Dr. Sarrai informing her that she had been "tentatively selected" for the Medical Officer position.[3] (Doc. 35-2 at 6, 9; Doc. 37 at 2.) The letter stated that Dr. Sarrai needed to undergo a background investigation before entering on duty, and advised:

> [i]f you are currently employed, please do not submit your resignation to your present employer until you have been informed that you have been cleared through a [background investigation] and that all of your pre-employment forms are satisfactory at which time an entrance on duty date will be established.

(Doc. 35-2 at 9.)

In January 2015, Wilbert Darwin was appointed Acting CEO of the ACLSU, replacing Ms. Detsoi. (Doc. 35 at 5; Doc. 35-3 at 2; Doc. 37 at 2.) On about February 16, 2015, Michelle Pino was appointed Acting Clinical Director, replacing Dr. Thorne.[4] (Doc. 35-4; Doc. 35 at 5.) As of that date, the ACLSU's management team consisted of Mr. Darwin, Ms. Pino,

---

[3] Dr. Sarrai disputes that the offer was tentative based on her deposition testimony that she understood she had been hired and would start in May 2015. (Doc. 37 at 2; Doc. 37-1 at 13-15.) However, her subjective belief does not give rise to a genuine factual dispute about the contents of the letter, which is in the record. (Doc. 35-2 at 9.)

[4] Dr. Sarrai disputes that Ms. Pino had replaced Dr. Thorne as Clinical Director by February 19, 2015, based on Dr. Sarrai's deposition testimony that Dr. Thorne was physically present and working at the ACLSU until one to three weeks after that date and did not tell Dr. Sarrai that he had been demoted or resigned. (Doc. 37 at 2; Doc. 37-1 at 17-20.) However, Dr. Sarrai's testimony reveals that she had no personal knowledge regarding Ms. Pino's appointment date or the capacity in which Dr. Thorne was working on or after February 19, 2015. As such, her testimony does not create a genuine issue of material fact in this regard. (Doc. 37-1 at 17-20.)

Administrative Officer Barbara Felipe, and Acting Director of Nursing Melvina Murphy. (Doc. 35 at 5; Doc. 35-3 at 2.) Mr. Darwin and Ms. Pino did not know that Dr. Sarrai had applied for the vacant Medical Officer position and received a tentative job offer at the time of their respective appointments.[5] (Doc. 35 at 5; Doc. 35-3 at 2; Doc. 35-4 at 3.)

In late January or early February 2015, Mr. Darwin learned that the ACLSU wanted to hire a Medical Officer and that Dr. Sarrai had applied for the position. (Doc. 35 at 6; Doc. 35-3 at 2; Doc. 37 at 3.) He asked Ms. Pino to review the applicant pool and provide the management team with a recommendation. (Doc. 35-3 at 2.) Ms. Pino reviewed the applicant pool and Dr. Sarrai's prior history. (Doc. 35-4 at 3-4.) Ms. Pino and "the management team" told Mr. Darwin that Dr. Sarrai was the only candidate for the position, and that she had a history of "patient and staff complaints" related to "hostility in the workplace; verbal outbursts and threats; unprofessional behavior; and the failure to comply with facility policies/procedures."[6] (Doc. 35-3 at 2; Doc. 35-4 at 4.)

Mr. Darwin declared that he "decided to make no selection" for the vacant Medical Officer position and to re-advertise it.[7] (Doc. 35-3 at 3.) He gave two reasons for his alleged decision, *i.e.*, that "the applicant list did not include enough qualified candidates" and that "Dr. Sarrai was not a good fit for the [ACLSU] based on the numerous complaints filed against her." (*Id.*) On February 18, 2015, Mr. Darwin sent an e-mail to Doris Edwards, an IHS Human Resources Specialist, in which he stated:

---

[5] Dr. Sarrai disputes this fact but points to no record evidence to contradict it. (Doc. 37 at 2.)

[6] Dr. Sarrai disputes the validity of the complaints based on her deposition testimony that they had already been "addressed" when Dr. Thorne was Clinical Director. (Doc. 37 at 3; Doc. 37-1 at 21.) However, she offers no evidence to dispute that the complaints were made.

[7] Dr. Sarrai disputes this fact based on her belief that she "had already been offered the position and would start in May. The only step remaining was a background check." (Doc. 37 at 3.)

> [w]e had another issue with [Dr.] Sarrai . . . today . . . . The Executive Committee leaders reviewed and discussed the issue this afternoon. A recommendation was made. We are requesting the withdrawal/rescinding of Dr. Mona Sarrai's selection for the [Medical Officer] position. How do we proceed? Justification: Hostility in the workforce, poor customer service, not a team player and infringement of courtesy and respect with the nurses. We are also requesting to re-advertise[] for this position[]. Please provide recommendations on how to.

(Doc. 35-2 at 10-11.) On February 19, 2015, Ms. Edwards sent a letter to Dr. Sarrai informing her of "management's decision to rescind the job offer to the position of Medical Officer" at the ACLSU. (Doc. 35-2 at 3, 12.) Dr. Sarrai continued to work at the ACLSU as a contract physician until July or August 2015. (Doc. 35-3 at 4; Doc. 35-4 at 4; Doc. 41-2 at 5.)

Dr. Sarrai contacted an HHS regional EEO office to initiate pre-complaint counseling on February 21, 2015. (Doc. 35 at 6; Doc. 35-5; Doc. 37 at 4.) On April 1, 2015, Dr. Sarrai filed a formal complaint with HHS alleging that the agency had discriminated against her on the bases of color (white), national origin (Tunisia), and sex (female). (Doc. 35-6 at 1-2.) In her formal complaint, she stated: "I believe I am being harassed at work by administration and especially Michelle Pino and Wil Darwin because they severed my contract in summer and now they are rescinding my position." (*Id.*) HHS identified her claims as follows: (1) "[f]rom February 2014 through May 2014, [Dr. Sarrai] alleged she was harassed because staff and the Director challenged her orders and patient care decisions," and (2) "[o]n or about February 20, 2015 [Dr. Sarrai] was informed her selection for a full time permanent position had been rescinded." (Doc. 35-7 at 1.) HHS dismissed these claims on June 5, 2015, and Dr. Sarrai filed an appeal with the U.S. Equal Employment Opportunity Commission ("EEOC") on July 2, 2015. (Doc. 35-7 at 1, 3; Doc. 35-8 at 1; Doc. 37-5 at 1.) The EEOC expanded the scope of Dr. Sarrai's first claim to include the early contract termination in 2014, affirmed the dismissal of the first claim, and reversed and remanded the dismissal of the second claim. (Doc. 37-5 at 3-4.) On remand, HHS

issued a final agency decision on September 9, 2016, which indicated that Dr. Sarrai had the right to file a civil action in federal court. (Doc. 35-11.)

In her Complaint for Employment Discrimination filed in this Court on November 29, 2016, Dr. Sarrai alleges that HHS discriminated against her on the bases of race, sex, and national origin in violation of Title VII "by subjecting her to a hostile work environment and rescinding her selection to the position of Medical Officer." (Doc. 1 at 3-4.) In the motion now before the Court, HHS seeks summary judgment as to all of Dr. Sarrai's claims. For the reasons discussed below, the Court grants the motion.

## II.  ANALYSIS

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). If the movant carries this initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the

nonmovant." *Id.* at 671.  If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to him.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Dr. Sarrai brings her claims pursuant to Title VII, which provides that it is unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Title VII supports both hostile work environment claims, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986), and claims based on "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire[.]"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

### A. Dr. Sarrai's Hostile Work Environment Claims

HHS argues that it is entitled to summary judgment on Dr. Sarrai's hostile work environment claims for three reasons, *i.e.*, that:  (1) Dr. Sarrai failed to exhaust her administrative remedies as to these claims because she abandoned them during the administrative process; (2) the claims are time barred because Dr. Sarrai failed to seek EEO counseling within 45 days of her May 2014 termination; and, (3) the claims fail on their merits.  (Doc. 35 at 18-23.)

As an initial matter, the Court must address the scope of Dr. Sarrai's hostile work environment claims.  HHS construes these claims as encompassing only Dr. Sarrai's work environment during her first contract term from February to May 2014.  (Doc. 35 at 18-21; Doc. 41 at 12.)  Dr. Sarrai, on the other hand, claims that the same hostile work environment resumed

when she returned to the ACLSU in October 2014, and continued up to and including the rescission of HHS' tentative job offer to her in February 2015. (Doc. 37 at 16-18.)

The Complaint and the record evidence support Dr. Sarrai's construction of her hostile work environment claims. In her Complaint, Dr. Sarrai alleges that, before HHS rescinded its job offer to her, Ms. Pino "subjected [her] to a hostile work environment."[8] (Doc. 1 at 2.) At her deposition, Dr. Sarrai testified that the alleged hostile work environment "continued" to "the later period" she worked at the ACLSU. (Doc. 37-1 at 6.) Finally, in her formal EEO complaint file-stamped April 7, 2015, Dr. Sarrai stated, "I believe I am being harassed at work by administration and especially [Ms.] Pino and [Mr.] Darwin because they severed my contract in summer and now they are rescinding my position." (Doc. 35-6 at 2.) The Court will therefore analyze HHS' motion in light of Dr. Sarrai's allegations that she was subjected to a hostile work environment from February 2014 to at least February 19, 2015.[9]

1. Whether Dr. Sarrai Abandoned her Hostile Work Environment Claims

HHS first argues that Dr. Sarrai abandoned her hostile work environment claims because she submitted a statement in support of her EEOC appeal that did not address these claims. (Doc. 35 at 20.) HHS also contends that Dr. Sarrai abandoned these claims because she failed to provide specific dates and information that HHS apparently requested during its initial investigation of her formal complaint. (Doc. 35-7 at 2; Doc. 41 at 12.) HHS concludes that, because she abandoned these claims, Dr. Sarrai failed to exhaust her administrative remedies regarding them. (Doc. 35 at 15-16 (citing *Khader v. Aspin*, 1 F.3d 968, 971 (10th Cir. 1993)

---

[8] In the Complaint, Dr. Sarrai refers to Ms. Pino as "a female Native American" who was appointed as the ACLSU's Clinical Director in February 2015 and who "previously held another position" there. (Doc. 1 at 2.)

[9] Dr. Sarrai has not identified any specific instances of harassment after HHS' rescission of its job offer to her on February 19, 2015. (*See generally* Docs. 1, 37.)

("[A] complainant who abandons his or her claim before the agency has reached a determination . . . cannot be deemed to have exhausted administrative remedies.").[10]) In response, Dr. Sarrai contends that she "appealed her hostile work environment claim[s] to the EEOC," which investigated and decided these claims. (Doc. 37 at 15.)

The Court finds that Dr. Sarrai has demonstrated a genuine issue of material fact regarding whether she pursued her hostile work environment claims to the conclusion of the administrative process. HHS contends that Dr. Sarrai did not appeal the agency's dismissal of these claims to the EEOC. However, in support of this contention it attached only the cover letter accompanying Dr. Sarrai's Notice of Appeal to the EEOC and the first page of her counsel's three-page Statement in Support of Appeal,[11] neither of which definitively proves the point. (Docs. 35-8, 35-9.) Then, the EEOC clearly did consider and address these claims in its decision. (Doc. 37- 5 at 3.) Further, that Dr. Sarrai failed to provide all of the information HHS requested during its investigation of her formal complaint is something less than abandonment; the record reflects that she did respond to the agency's request, albeit incompletely. (Doc. 35-7 at 2.) Finally, as noted above, Dr. Sarrai includes the rescission of HHS' job offer to her in her hostile work environment claims, and it is beyond dispute that she exhausted her administrative remedies as to that act. (Docs. 35-5 to 35-11.) For these reasons, the Court denies HHS' motion

---

[10] The Tenth Circuit has overruled *Khader* on other grounds. As in many other decisions, the court in *Khader* held that exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII. 1 F.3d at 971. However, in *Lincoln v. BNSF Rwy. Co.*, 900 F.3d 1166 (10th Cir. 2018), the Tenth Circuit held that "a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." *Id.* at 1185.

[11] This document does not preclude the possibility that Dr. Sarrai appealed the dismissal of her hostile work environment claims to the EEOC because it is incomplete, and the single page provided does not expressly disavow an appeal of those claims, though it does address only her "claim for non-selection." (Doc. 35-9.)

for summary judgment on Dr. Sarrai's hostile work environment claims on the basis that she abandoned these claims during the administrative process.

2.      Whether Dr. Sarrai Timely Sought EEO Counseling regarding her Hostile Work Environment Claims

Next, HHS correctly observes that Dr. Sarrai may not pursue a Title VII claim based solely on incidents that occurred from February to May 2014, because to do so she would have had to seek EEO counseling within 45 days of May 30, 2014.  (Doc. 35 at 21.)  However, Dr. Sarrai is not pursuing such a claim.  Rather, she permissibly relies on alleged hostile acts that began during her first contract term and continued through February 2015, after which she timely initiated EEO counseling on February 21, 2015.  (Doc. 35-5; Doc. 37 at 16-17.)  As the Tenth Circuit explained,

> [a] hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice.  Thus, the unlawful employment practice cannot be said to occur on any particular day.  Rather, it takes place over time, and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.  Consequently, it does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016) (internal quotation marks and citations omitted); *see also Nat'l R.R. Passenger Corp.*, 536 U.S. at 113 (an employee may rely on prior acts—even discrete acts that would not be actionable because they are time barred—as evidence in support of a timely claim).

In its reply, HHS suggests that Dr. Sarrai cannot rely on acts that occurred during both of her contract terms to establish a single hostile work environment, citing cases for the proposition that there is no single hostile work environment where a plaintiff transfers from one department to another.  (*See* Doc. 41 at 12-13.)  However, the cases HHS cites are inapposite.  Although

there is a gap of about four months between Dr. Sarrai's two contract terms, HHS points to no evidence that she transferred departments or was otherwise working in a different place or was subjected to harassment that was different in type, frequency, and perpetrator.[12]  *See Hansen*, 844 F.3d at 923 (to determine whether particular acts are part of same actionable hostile work environment, courts consider non-exclusive factors including whether acts are "related by type, frequency, and perpetrator" and occurred "when the employee was working in the same place"). The Court finds that HHS has failed to demonstrate the absence of a genuine issue of material fact regarding whether Dr. Sarrai can properly rely on acts that occurred during both of her contract terms to establish a single hostile work environment.  For these reasons the Court will deny HHS' motion for summary judgment on Dr. Sarrai's hostile work environment claims on the basis that she did not timely seek EEO counseling.

3.      The Merits of Dr. Sarrai's Hostile Work Environment Claims

Finally, HHS challenges Dr. Sarrai's hostile work environment claims on their merits. For a hostile environment claim to survive summary judgment,

> a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*McCowan v. All Star Maint., Inc*., 273 F.3d 917, 923 (10th Cir. 2001).  The challenged conduct must be *objectively* hostile—meaning that a reasonable person would find it to be so—and *subjectively* hostile—meaning that the plaintiff found it to be so.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).   To determine whether a reasonable person would find an environment sufficiently hostile, the Court must consider all of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

---

[12] Dr. Sarrai claims that Ms. Pino was the principal perpetrator during both of her contract terms at the ACLSU. (Doc. 35-1 at 9; Doc. 35-4 at 2-3; Doc. 35-6 at 2; Doc. 37-1 at 15-17.)

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997); *Al-Kazaz v. Unitherm Food Sys., Inc.*, 594 F. App'x 460, 462 (10th Cir. 2014).[13]

In addition, a plaintiff must show that she was harassed because of her membership in a protected class to prove a hostile work environment claim under Title VII. *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005).

> Title VII is not a code of workplace conduct, nor was it designed to bring about a magical transformation in the social mores of American workers. Title VII targets discrimination. Thus, a hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment based on gender.

*Id.* at 833 (internal quotation marks and citation omitted); *see also Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (Title VII does "not guarantee a utopian workplace, or even a pleasant one[.]").

In its motion, HHS argues that Dr. Sarrai has failed to show that she was subjected to severe and pervasive hostility at the ACLSU, or that such hostility was due to her sex, race, or national origin. (Doc. 35 at 22.) In response, Dr. Sarrai relies on the following incidents to support her hostile work environment claims.

On one occasion, Dr. Sarrai saw a patient who told her he only spoke Navajo, though in fact he also spoke English. (Doc. 37-1 at 1.) Dr. Sarrai called a Navajo colleague to interpret for her. (*Id.*) The diabetic educator knew the patient spoke English and complained to Dr. Robert Salek that Dr. Sarrai was refusing to see the patient. (*Id.* at 2.) Dr. Salek then asked Dr. Sarrai why she was refusing to see the patient, and Dr. Sarrai explained the circumstances to him. (*Id.*)

---

[13] In the Tenth Circuit, unpublished decisions are not binding precedent but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

On another occasion, Dr. Sarrai ordered x-rays of a patient's spine because the patient had acute back pain. (Doc. 37-1 at 3.) The radiology technician complained to Dr. Salek that Dr. Sarrai was ordering too many x-rays. (*Id.*) Dr. Salek asked Dr. Sarrai why she was ordering too many x-rays. (*Id.*) Dr. Sarrai believed that Dr. Salek, a podiatrist, should not have questioned her decision. (*Id.* at 3-4.) Dr. Sarrai also believed that the technician could have combined all of the x-rays into one. (*Id.* at 4.) Further, Dr. Sarrai concluded that the x-rays she ordered were justified because they revealed that the patient had a compression fracture. (*Id.*)

On a third occasion, Dr. Sarrai called the tribal police to the ACLSU because a patient came to her office seeking Percocet. (Doc. 37-1 at 4.) Nurse Tim Gruber dismissed the police and reported the incident to Dr. Salek who, in turn, reported the incident to the CEO. (*Id.*; Doc. 41-2 at 4.) This incident resulted in the early termination of Dr. Sarrai's contract on May 30, 2014. (Doc. 35 at 4; Doc. 37-1 at 4.)

In addition, as discussed above, Dr. Sarrai relies on HHS' February 2015 rescission of its job offer to her to support her hostile work environment claims.

Finally, as a general matter, Dr. Sarrai testified that ACLSU staff members were

wired in their mind to accept a man, white doctor who would be prescribing narcotics all the time who would not object about people taking whatever food, a doctor who might not object about writing disability forms and then handicapped placards[,]

while she would not do these things. (Doc. 37-1 at 5-6.) As evidence that staff members were hostile to her approach to patient care because of her sex, race, and national origin, Dr. Sarrai testified that Dr. Thorne, a white male, took the same approach to prescribing narcotics but was not subjected to hostility. (Doc. 37-1 at 8.) She added that "Dr. Savatsky never received any complaints because he was a pill mill, and he's white. I know that Dr. Kileen, who worked in Canoncito, never got any complaints because he's white and he's a man." (*Id.*)

The Court finds that, as a matter of law, Dr. Sarrai has failed to present sufficient evidence to allow a rational juror to find that she was subjected to severe and pervasive harassment because of her sex, race, or national origin. The Court is doubtful that the four acts or incidents (and a general mindset) over the course of a year, most of them indisputably mundane, are sufficiently severe and pervasive to constitute actionable harassment. *Cf. Sprague*, 129 F.3d at 1366 (five incidents of supervisor's "unpleasant and boorish conduct" over sixteen months insufficiently severe or pervasive to establish hostile work environment).

However, even if they were severe and pervasive, Dr. Sarrai has presented insufficient evidence to allow a rational factfinder to conclude that any of these acts or incidents occurred because of her sex, race, or national origin. Although the incidents Dr. Sarrai describes suggest a measure of friction between her and her supervisors and coworkers, she has failed to present evidence that one or more of her protected characteristics caused that friction.[14] *See Trujillo*, 157 F.3d at 1214 (a collection of unrelated incidents where the plaintiff and his supervisor were at odds was insufficient to show hostile work environment where the plaintiff was not subjected to physical threats, humiliation, or offensive utterances arising from discriminatory animus); *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (insufficient evidence of racially hostile work environment where "the intimidation, ridicule, and insult were directed indiscriminately, not targeted at [the plaintiff] due to his race"); *cf. Chavez*, 397 F.3d at 833 (facially neutral conduct can support a finding of discriminatory hostile work environment when that conduct occurs in the context of other, overtly discriminatory conduct).

---

[14] Dr. Sarrai did testify that a physician assistant posted a discriminatory comment about her national origin on Facebook after both she and the physician assistant no longer worked at the ACLSU. (Doc. 37-1 at 9.) She also testified that "patients" made discriminatory comments about her national origin. (*Id.*) However, she neither argues nor demonstrates that HHS is responsible for the physician assistant's and patients' conduct because it failed to remedy or prevent a hostile or offensive work environment of which management-level employees knew or reasonably should have known. *Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255, 1257 (10th Cir. 2003); *Turnbull v. Topeka St. Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998). As such, HHS cannot be found liable for these alleged comments as a matter of law.

Dr. Sarrai tries to demonstrate discriminatory animus by claiming that similarly situated white male colleagues were not treated with the same hostility. (Doc. 37 at 20.) Her attempt, however, is fatally flawed. First and most obviously, Dr. Sarrai affirmatively testified that these colleagues are white, *i.e.*, they and she are of the same race. (Doc. 37-1 at 8.) Thus, on its face, her testimony has no tendency to show that persons of another race were treated more favorably than she was. Second, Dr. Sarrai did not testify to the national origin of these colleagues, and so again, on its face, her testimony has no tendency to show that persons of domestic national origin were treated more favorably than she was. (*Id.*)

Finally, the undisputed record evidence shows that none of the colleagues Dr. Sarrai identifies were similarly situated to her. Dr. Sarrai testified that Dr. Thorne, a male, received more favorable treatment than she did even though both doctors took the same approach to prescribing narcotics. However, Dr. Thorne was the ACLSU's Clinical Director, while Dr. Sarrai was a contract physician who worked there for about a year. (Doc. 35-2 at 1-2; Doc. 35-3 at 1-3; Doc. 37-1 at 16-17.) Further, although Dr. Sarrai claims that she and Dr. Thorne took the same approach to prescribing narcotics, there is no record evidence that Dr. Thorne ever summoned the police in response to a patient seeking narcotics. In these circumstances, Dr. Sarrai's testimony that Dr. Thorne received more favorable treatment than she did does not give rise to a reasonable inference that the difference in treatment was due to her sex, race, or national origin. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (that a supervisor received more favorable treatment than a subordinate is legally irrelevant in Title VII context because the two were not similarly situated); *Mitchell v. City of Wichita, Kan.*, 140 F. App'x 767, 780 (10th Cir. 2005) (more favorable treatment of employees outside protected class does not

raise inference of discrimination unless those employees are subject to the same responsibilities, expectations, and discipline as the plaintiff).

Dr. Sarrai identified two other ACLSU physicians as white males who received more favorable treatment than she did, *i.e.*, Drs. Savatsky and Kileen. However, Dr. Sarrai's own testimony indicates that these two physicians were not similarly situated to her either. Specifically, Dr. Sarrai testified that Dr. Savatsky was a "pill mill," *i.e.*, a physician who took a very different approach to prescribing medications than she claims to have done, and that Dr. Kileen worked "in Canoncito," whereas she worked in Acoma. (Doc. 37-1 at 8.) In sum, while Dr. Sarrai's work environment at the ACLSU may have been unpleasant and strained, she has failed to present any evidence that the discord she experienced was due to her sex, race, or national origin. As such, the Court grants HHS summary judgment on Dr. Sarrai's hostile work environment claims in Counts I, II, and III of her Complaint.

**B.** **Dr. Sarrai's Discrimination Claims Based on the Rescission of HHS' Tentative Job Offer**

HHS also argues that the Court should grant it summary judgment on Dr. Sarrai's claims that it discriminated against her by rescinding the tentative job offer it had previously made to her. Absent direct evidence of discrimination, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs the Court's analysis of employment discrimination claims based on discrete adverse employment actions. *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315-16 (10th Cir. 2017). Pursuant to this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. In the failure-to-hire context, this requires a plaintiff to show that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and, (4) after

her rejection, the position remained open and the employer continued to seek applicants from persons of her qualifications. *Id.*

If the plaintiff satisfies this initial burden, the burden shifts to "the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* To carry this burden, the employer "must clearly set forth, through the introduction of admissible evidence, reasons for its action which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000).

If the employer articulates a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff, who must then demonstrate that the stated reason for the employer's decision "was in fact pretext." *McDonnell Douglas Corp.*, 411 U.S. at 804. To show pretext, a plaintiff must present evidence showing that the employer's proffered reason is "so incoherent, weak, inconsistent, or contradictory that a rational fact finder could conclude that the reason is unworthy of belief." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008); *Green v. New Mexico*, 420 F.3d 1189, 1192-93 (10th Cir. 2005). "Although a plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual," pretext is typically established by evidence demonstrating that "the defendant's stated reason for the adverse employment action was false," or that the defendant acted contrary to company policy or practice when making the adverse employment decision. *Green*, 420 F.3d at 1193.

HHS argues that the Court should grant it summary judgment on Dr. Sarrai's claims based on the rescission of its job offer to her because: (1) she cannot establish a prima facie case

of race or national origin discrimination[15]; (2) it had legitimate, nondiscriminatory reasons for the rescission; and, (3) she has not shown these reasons to be pretextual.  (Doc. 35 at 11-18.)

    1.    <u>Dr. Sarrai's Prima Facie Case of Discrimination</u>

HHS first challenges Dr. Sarrai's ability to prove a prima facie case of race discrimination.  It is undisputed that Dr. Sarrai is white.[16]  (Doc. 35-6 at 2; 35-11 at 1.)  "Title VII . . . proscribe[s] racial discrimination in . . . employment against whites on the same terms as racial discrimination against nonwhites." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279 (1976).  However, because whites are a historically favored majority, a white plaintiff must "establish background circumstances that support an inference that [the defendant] is one of those unusual employers who discriminates against the majority," in lieu of showing that she belongs to a protected class.  *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992). HHS argues that Dr. Sarrai has failed to make such a showing.

Dr. Sarrai tries to demonstrate that HHS is an employer that discriminates against the majority by pointing to the IHS' "Indian preference requirement."  (Doc. 37 at 11.)  Pursuant to the Wheeler-Howard Act, 25 U.S.C. §§ 5101 *et seq.*, "qualified Indians shall . . . have the preference to appointment to vacancies in any" positions in the "administration of functions or services affecting any Indian tribe." 25 U.S.C. § 5116; *Morton v. Mancari*, 417 U.S. 535, 537 (1974).  The Supreme Court has held that this requirement is not a racial preference and does not constitute racial discrimination.  *Morton*, 417 U.S. at 553, 545-51; *see also Prunier v. Norton*, 468 F.Supp.2d 1344, 1351 (D.N.M. 2006) (the selection of a qualified Indian candidate to a

---

[15] HHS does not challenge Dr. Sarrai's prima facie case of sex discrimination.  (Doc. 35 at 16-18.)

[16] Although Dr. Sarrai testified that her skin is "olive," she consistently identifies her race as "white."  (*See, e.g.*, Doc. 1 at 1; Doc. 35-6 at 2; Doc. 37-1 at 10-11.)  Additionally, although Dr. Sarrai argues that she is "not part of a majority class of Caucasians" because she is a "white foreign national," this is due to her national origin, not her race.  (Doc. 37 at 11.)

position subject to the Indian preference requirement "cannot constitute unlawful [race] discrimination as a matter of law"). "The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." *Morton*, 417 U.S. at 554. As such, Dr. Sarrai's reliance on the Indian preference requirement as evidence that HHS discriminates on the basis of race must fail.

Dr. Sarrai has submitted no other evidence to support her argument that HHS discriminates against whites, and thus, she has not satisfied her burden of establishing a prima facie case that HHS rescinded the tentative job offer it made to her because she is white. Accordingly, the Court grants HHS summary judgment on Dr. Sarrai's race discrimination claim in Count I of her Complaint based on the rescission of HHS' tentative job offer to her.[17]

HHS also challenges Dr. Sarrai's prima facie case of national origin discrimination, based on evidence that Mr. Darwin did not know Dr. Sarrai's national origin when he decided to rescind the tentative job offer to her.[18] (Doc. 35 at 17.) As HHS argues, if the decisionmaker is not aware of the plaintiff's national origin, the plaintiff cannot establish a prima facie case of national origin discrimination because it is impossible to infer that the decisionmaker acted with discriminatory intent. (Doc. 35 at 17 (citing *Owens v. Donahoe*, 913 F.Supp.2d 1055, 1062 (D. Colo. 2012)); *see also, e.g., Chawla v. Lockheed Martin Corp.*, 69 F. Supp.3d 1107, 1125-26 (D. Colo. 2014) (employment decision was not discriminatory as a matter of law because, *inter alia*, there was no evidence on which a reasonable juror could conclude that decisionmakers were

---

[17] Because it grants HHS summary judgment on Dr. Sarrai's race discrimination claim for this reason, the Court will not address HHS' other arguments in opposition to this claim.

[18] The record evidence demonstrates that Dr. Sarrai is an American citizen of Tunisian cultural and linguistic characteristics. (Doc. 35-6 at 2; Doc. 37-1 at 5, 10.) As such, she is a member of a protected national origin group under Title VII. 29 C.F.R. § 1606.1.

aware of plaintiff's national origin and/or religion); *cf. EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) ("[I]t is undisputed that [the formal decisionmaker] worked in a different city and had no idea that [the plaintiff] is black. She therefore could not have acted for racially discriminatory reasons.").

Here, HHS presents Mr. Darwin's declaration that he did not know Dr. Sarrai's national origin when he decided to rescind the tentative job offer made to her. (Doc. 35-3 at 3.) Also, Dr. Sarrai concedes that Mr. Darwin had never had a conversation with her and knew her only "on paper" at the time. (Doc. 35-1 at 9.) Dr. Sarrai claims that Mr. Darwin would nevertheless have known her national origin based on a document entitled "Albuquerque Area Indian Health Service Application; Clinical Staff Appointment." (Doc. 37-2.) This document indicates, *inter alia*, that Dr. Sarrai is an American citizen born in Fort Leavenworth, Kansas; that she speaks English, French, and Arabic; that she attended medical school in Tunisia; and, that she moved from Tunisia to the United States and studied for an English-language proficiency test between 2000 and 2002. (*Id.*) The Court agrees that this document would likely inform the average reader that Dr. Sarrai is of Tunisian origin. 29 C.F.R. § 1606.1. However, there is no record evidence to suggest that Mr. Darwin ever read it. The form is dated received January 6 and 9, 2014, when Dr. Sarrai first applied to work at the ACSLU and a year before Mr. Darwin was appointed as its CEO. (*Id.*) Further, Dr. Sarrai has presented no evidence regarding what documents Mr. Darwin did review or should have reviewed in February 2015 in deciding whether to rescind the tentative job offer made to her. In short, Dr. Sarrai has failed to demonstrate a genuine issue of material fact regarding whether Mr. Darwin knew her national origin at the relevant time.

However, substantial record evidence shows that Ms. Pino also participated in the decision to rescind the job offer at issue and provided Mr. Darwin with the information on which he based his decision. (*See* Doc. 35-2 at 10 ("The Executive Committee . . . [is] requesting the withdrawal/rescinding of Dr. Mona Sarrai's selection[.]"); Doc. 35-3 at 2 (Mr. Darwin asked Ms. Pino "to provide the management team with a recommendation" regarding the vacant Medical Officer position.); Doc. 35-4 at 3 (Ms. Pino's job duties included "participating in medical personnel decisions, including hiring and firing."); *id.* at 4 (Ms. Pino "reviewed the prior history of Dr. Sarrai" and "informed Mr. Darwin regarding Dr. Sarrai's prior history, including patient and staff complaints. Mr. Darwin concluded that Dr. Sarrai was not a good fit for the [ACLSU]."); Doc. 37-3 at 9-10 ("The individuals involved in the decision [that Dr. Sarrai was not the appropriate candidate to receive the Medical Officer position] were the Acting Clinical Director, Michelle Pino, and the Acting CEO, Wil Darwin."); *see also BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d at 487 (employee can demonstrate employer's liability based on "a biased subordinate's discriminatory reports, recommendation, or other actions" where the subordinate's actions caused the formal decisionmaker's adverse decision).

The record evidence also permits the inference that Ms. Pino knew Dr. Sarrai's national origin by February 2015, including evidence that Dr. Sarrai spoke with a foreign accent and Ms. Pino had heard her speak on several occasions. (Doc. 37-1 at 10-11; Doc. 35-4 at 2.) As such, the Court finds that Dr. Sarrai has demonstrated a genuine issue of material fact regarding whether she can establish a prima facie case of national origin discrimination based on Mr. Darwin's and Ms. Pino's decision to rescind the tentative job offer made to her.

2.      HHS' Evidence of Legitimate, Nondiscriminatory Reasons

In his sworn declaration, Mr. Darwin identified two reasons for the decision to rescind the tentative job offer made to Dr. Sarrai. First, he stated his belief that the applicant list of one did not include enough qualified candidates to allow a good selection. (Doc. 35-3 at 2-3.) Second, he attested that Dr. Sarrai was not a good fit for the ACLSU. (*Id.* at 3.) In support of the second point, Mr. Darwin declared that patients and staff had made "numerous complaints" against Dr. Sarrai concerning hostility in the workplace, verbal outbursts and threats, unprofessional behavior, and the failure to comply with facility policies and procedures. (*Id.* at 2-3.) Mr. Darwin attested that these complaints "depicted [Dr. Sarrai] as someone lacking empathy and the temperament and interpersonal skills needed for the job." (*Id.* at 3.) Additionally, Mr. Darwin stated that the management team did not view Dr. Sarrai as a team player. (*Id.*)

Mr. Darwin attached five complaints the ACLSU received about Dr. Sarrai to his declaration, three from October 2014 and two from January 2015. In the first complaint, a patient reported that he had a confrontation with Dr. Sarrai in a hallway about his return-to-work documentation. (*Id.* at 5.) Per the complaint, Dr. Sarrai told him: "Your infection does not require you to be off work. It's not Ebola," and "[y]ou people are lazy." The patient understood "you people" to refer to Native American people. (*Id.*)

The patient in the second complaint reported that he or she felt "attacked" during a visit with Dr. Sarrai, adding "[y]es my health is bad, but to be put so low, and I have been tryin[g] to better myself it hurts." (*Id.* at 6.)

The patient in the third complaint called Dr. Sarrai "very rude" and "very careless and heartless" because Dr. Sarrai did not give the patient "a chance to cope with" the news that he or she had diabetes and "acted like it was nothing." (*Id.* at 7.)

In the fourth complaint, an anonymous staff member wrote that Dr. Sarrai "was needed for an important issue to complete processing a situation for a patient" but was "nowhere to be found," though she was on duty and had been paged several times. (*Id.* at 8.) According to the staff member, when Dr. Sarrai "finally appeared" two hours later she explained that she had been resting or sleeping in an in-patient room because she was feeling unwell. (*Id.*) The staff member described Dr. Sarrai's conduct as "unprofessional and unethical" and "her attitude . . . about being gone" as "pretty lackadaisical." (*Id.*)

Finally, the patient in the fifth complaint reported that Dr. Sarrai made a phone call in front of the patient during his or her appointment, in which Dr. Sarrai talked about another person's medicine and chart number. (*Id.* at 9.) The patient felt this behavior was "[s]o rude" that he or she "was about to get up and walk out[.]" (*Id.*)

Likewise, Ms. Pino declared under oath that she reviewed "many complaints from patients and staff regarding Dr. Sarrai's unprofessional behavior[,] her failure to comply with ACLSU policies and procedures[,] her hostility at work[,] and additional outbursts and threats." (Doc. 35-4 at 2, 4.) In addition, Ms. Pino described the following incidents, which she claims she personally witnessed:

> In May 2014 . . . Dr. Sarrai had a confrontation with a patient. The dispute arose when Dr. Sarrai had refused to refill the patient's prescription. Instead of calmly resolving the situation (for instance, by referring the patient to another provider), Dr. Sarrai yelled at the patient to leave the office. While the patient was speaking calmly, Dr. Sarrai continued to yell at the patient. Dr. Sarrai brought the patient to tears. Dr. Sarrai even called the tribal police. Other . . . staff members and I stepped in to resolve the situation. [S]taff separated Dr. Sarrai and the patient, who was very unhappy with Dr. Sarrai's treatment and lack of professionalism.

> In . . . late 2014 or early 2015 . . . I . . . heard Dr. Sarrai yelling at another patient. Dr. Thorne, the Clinical Director, was paged to intervene in order to resolve the situation.

In about February 2015, Dr. Sarrai . . . was yelling at a patient. Dr. Sarrai called the police, who again came to the facility. Again, I was paged to intervene. [S]taff and I had to step in to separate Dr. Sarrai from the patient, and to calm the situation. I asked Dr. Sarrai to leave for the rest of the day, because she was not in the appropriate condition to treat patients.

In February 2015, Dr. Sarrai had an incident with a staff member. The staff member was performing a routine administrative task—working on an email regarding birthdays. . . . Dr. Sarrai interrupted the staff member's conversation, and stated that instead of working on birthday celebrations, the nurses should be studying. Dr. Sarrai then challenged the nurse's competence, and . . . threatened to call the Board of Registered Nursing. Other staff members and I had to intervene[.]

(*Id.* at 2-3.) Ms. Pino attested to her belief that

Dr. Sarrai's conduct issues did not make her the appropriate person for the Medical Officer position. For instance, Dr. Sarrai's poor customer service, hostility in the workplace, and lack of courtesy and respect for the nurses made Dr. Sarrai a poor fit for long-term employment at [the ACLSU].

(*Id.* at 4.) In light of the foregoing, the Court concludes that HHS has met its burden of articulating legitimate, non-discriminatory reasons for rescinding the tentative job offer it extended to Dr. Sarrai.

3.     Dr. Sarrai's Evidence of Pretext

Dr. Sarrai argues that HHS' proffered reasons for rescinding the tentative job offer it made to her are a pretext for discrimination based on her sex and national origin. (Doc. 37 at 13-15.) Dr. Sarrai first tries to show pretext by claiming that HHS failed to follow its policies and procedures in rescinding the tentative job offer. (*Id.* at 13-14.) The evidence shows that HHS has a written policy governing "Vacancy Announcements" that provides:

[s]electing officials may decide not to make a selection from the . . . candidates presented for consideration. Such decisions must, of course, be for sound management purposes and not to circumvent the spirit or letter of the Indian preference requirement . . . . The "No-Selection" decision . . . may be made not to fill the position at that time, to cancel or abolish the position, or to re-advertise the position in an effort to identify additional candidates.

(Doc. 35-2 at 13.)  Dr. Sarrai argues that HHS "disregarded" this policy because she "was no longer a candidate that Mr. Darwin could decide not to hire" once HHS extended an offer to her. (Doc. 37 at 13.)  While Dr. Sarrai correctly observes that the policy does not expressly allow a tentative job offer to be rescinded, neither does it prohibit such an action.  Thus, the evidence does not support Dr. Sarrai's argument that HHS disregarded or violated the policy.  Similarly, Dr. Sarrai is correct that the letter extending the tentative job offer indicated that the offer was contingent on a successful background check; however, nowhere does the letter state that the offer could not be rescinded for other reasons before she began working.  (Doc. 35-2 at 9.)

Dr. Sarrai also tries to show pretext by arguing that:  (1) HHS never confirmed that the complaints about her were true; (2) patients and staff at the ACLSU complained about her because of her sex and national origin; (3) Mr. Darwin and Ms. Pino failed to inform her of their reasons for rescinding the tentative job offer; (4) she was retained as a contract physician for several months after the rescission; and, (5) Ms. Pino should not have participated in the rescission because Dr. Thorne was still the Clinical Director at the time.  (Doc. 37 at 14-15.) This array of arguments does not give rise to a genuine issue of fact as to whether Mr. Darwin's and Ms. Pino's reasons for rescinding the tentative job offer to Dr. Sarrai are unworthy of belief.

To Dr. Sarrai's first point, "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination."  *Estate of Daramola v. Coastal Mart, Inc.*, 170 F. App'x 536, 544 (10th Cir. 2006).  "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Lobato v. N.M. Env. Dept.*, 733 F.3d 1283, 1289 (10th Cir. 2013)*.*  Here, even if the complaints about Dr. Sarrai were inaccurate, she has presented no evidence to challenge their existence, the sincerity of the complainants in making

them, or Mr. Darwin's and Ms. Pino's sincerity in relying on them.[19] Thus, that Mr. Darwin and Ms. Pino failed to confirm the complaints' accuracy does not give rise to a reasonable inference that their stated reliance on these complaints is pretextual.

Similarly, as to Dr. Sarrai's second point, her testimony that ACLSU patients and staff complained about her because of her sex and national origin does not give rise to a reasonable inference that Mr. Darwin's and Ms. Pino's stated reliance on these complaints was a sham to hide discriminatory intent. There is no record evidence that either supervisor knew or had reason to suspect any bias on the complainants' part.

Nor do Dr. Sarrai's remaining points create a fact issue concerning the authenticity of Mr. Darwin's and Ms. Pino's stated reasons for rescinding the tentative job offer extended to Dr. Sarrai. In light of Mr. Darwin's contemporaneous email to Ms. Edwards explaining the executive committee's reasons for deciding to rescind the offer, and Mr. Darwin's and Ms. Pino's consistent declarations regarding their reasons for the decision, that they failed to inform Dr. Sarrai of these reasons does not support an inference of pretext. *Cf. Jaramillo*, 427 F.3d at 1311 ("employer's change of position late in the proceedings was 'fishy'") (citing *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 678 (7th Cir. 2003)).

That Dr. Sarrai remained at the ACLSU as a contract physician until July or August 2015 likewise does not render Mr. Darwin's and Ms. Pino's reasons for rescinding the tentative job offer unworthy of belief. It is unremarkable that HHS would have more demanding standards for

---

[19] Mr. Darwin did admit that in a prior affidavit he stated, "Dr. Sarrai had not been selected for the Medical Officer position," while he now "acknowledge[s] that a tentative offer of employment was made to Dr. Sarrai." (Doc. 35-3 at 3.) Moreover, his e-mail to Ms. Edwards shows that he knew Dr. Sarrai had been selected when he decided to rescind the offer. (Doc. 35-2 at 10 ("We are requesting the withdrawal/rescinding of Dr. Mona Sarrai's selection for the [Medical Officer] position").) This does cast some doubt on Mr. Darwin's credibility. However, his false statement is "not so intertwined" with the reasons for his decision as to raise "a genuine issue of pretext," nor does it show that he is "a liar in an outrageous manner . . . and should not be believed as to other issues." *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005). It also does nothing to undermine Ms. Pino's credibility.

permanent employees than for short-term contractors. Consistent with this proposition, both Mr. Darwin and Ms. Pino declared that, "[d]ue to short term staffing needs," it was appropriate for Dr. Sarrai to continue to work at the ACLSU as a contract physician even though her conduct issues made her an inappropriate person for the Medical Officer position. (Doc. 35-3 at 4; Doc. 35-4-at 4.) Dr. Sarrai presents no evidence to contradict Mr. Darwin's and Ms. Pino's declarations on this point.

Finally, Dr. Sarrai's unfounded belief that Ms. Pino had not yet been appointed Acting Clinical Director at the time she participated in the decision to rescind the tentative job offer entirely fails to show that Mr. Darwin's and Ms. Pino's stated reasons for the rescission are pretextual.

In sum, HHS articulated legitimate, non-discriminatory reasons for rescinding the tentative offer of employment it extended to Dr. Sarrai, and Dr. Sarrai has not submitted evidence from which a reasonable juror could find those reasons unworthy of belief. *Green*, 420 F.3d at 1192-93. Accordingly, HHS is entitled to summary judgment on Dr. Sarrai's claims of sex and national origin discrimination in Counts II and III of her Complaint based on HHS' rescission of the tentative job offer at issue.

## III. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. 35) is **GRANTED**.

**IT IS SO ORDERED.**

**KIRTAN KHALSA**
**United States Magistrate Judge**
Presiding by Consent